Filed 4/1/15  Spennato v. Dental Bd. of California CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PETER SPENNATO, JR., | B253560 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS140221) |
| v. | |
| DENTAL BOARD OF CALIFORNIA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Robert O'Brien, Judge.  Affirmed.

Norman L. Schafler for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Jim Ledakis, Assistant Attorney General, Marc D. Greenbaum and Morgan Malek, Deputy Attorneys General for Defendant and Respondent.

Peter Spennato, Jr. (appellant) appeals from a judgment of the superior court denying his petition for writ of mandate. Through the writ of mandate, appellant sought to overturn a decision of the Dental Board of California (the Board) revoking appellant's dental license. Appellant argues that the penalty imposed was excessive in light of the evidence. He also challenges certain findings of the trial court as not supported by the evidence. We find that the penalty imposed was authorized and fell within the Board's discretion, and that the evidence supports the trial court's findings. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The accusation

In March 2011 the Executive Officer of the Board filed an accusation against appellant for gross negligence, repeated acts of negligence, and unprofessional conduct. The accusation was amended several times. The operative accusation is the third amended accusation (accusation), which was filed in January 2012.

The accusation alleges that appellant was licensed by the Board in April 1992. Appellant's dental license was in full force and effect at all relevant times.

On or about March 8, 2004, patient E.S. (E.S. or patient) sought treatment from appellant for an evaluation of whether her old crowns and bridges should be replaced. Appellant provided dental treatment to E.S. from March 2004 through October 2005. The accusation alleged that such treatment was substandard and grossly negligent.

#### *Factual summary of treatment of E.S.*

The accusation included a factual summary of the treatment of E.S., including the following allegations:

Although appellant's periodontal examination findings clearly identified the presence of periodontal disease, a non-therapeutic procedure was performed. Further, fixed prosthetic procedures, bridges on the upper left, lower left, and upper right were performed to completion prior to performance of periodontal services.

Appellant's documentation of patient's records omitted an informed consent process discussing the risks, benefits and alternatives of treatment. Patient paid no co-pay or any fees to appellant's office. As required by the dental practice act and by

2

statute, each entry in the patient dental record should have an identifier, initials, signature, or license number, indicating the provider of care.

From March 8, 2004, to October 25, 2005, appellant placed a bridge from tooth No. 13 to No. 15 and from No. 19 to No. 21. On March 3, 2005, patient was to see Dr. Thomas Omoto, an oral surgeon, for extraction of tooth No. 3. Patient was instructed by appellant to go immediately to appellant's office following the extraction. Impressions and/or an acrylic temporary bridge were taken at appellant's office, and they got too hard. Appellant's assistant, Pixie Peterson (Peterson), yanked the impressions and/or acrylic temporary bridge out of patient's mouth, causing a hole that did not heal. As a result, patient suffered a severe infection.

On July 15, 2005, when the bridge spanning tooth No. 2 to No. 6 was to be placed, patient complained about the fact that she could feel air in her sinus. Appellant examined the area, and it was noted that there was an oral antral fistula. Appellant referred patient back to oral surgeon Dr. Omoto, for an examination, before the bridge could be seated. On or about August 3, 2005, Dr. Omoto sutured the opening. However, from August through November 2005, patient continued to experience pain.

According to patient, appellant allowed his dental assistant(s) to perform procedures not included in their permitted duties. On July 25, 2005, appellant's assistant, Peterson, placed patient's permanent bridge from tooth No. 2 to No. 6 on and off. When patient told Peterson she was having pain, Peterson took the bridge off, looked in her mouth and told her there was a hole the size of a straw.

In October 2006, Dr. Ray Kuwahara examined the patient and found multiple crown and bridge margins that were short of the tooth structure, decayed, and open but only noted those issues for tooth Nos. 31 and 18, neither of which were treated by appellant. On October 19, 2006, patient presented to the offices of Dr. Roy Yanese, Diplomat of American Board of Prosthodontics, for a comprehensive examination. Dr. Yanese determined that there were poor fitting margins on several teeth, caries present, extensive space below pontic No. 3 allowing food accumulation and defective oral hygiene, and that the right side had no occlusion where the bridge was placed. Dr.

3

Yanese determined that there was an obvious decision error in making impressions of a large span bridge following an extraction and an obvious oral-antral opening that at least could have been blocked out. He further noted that silicone impression material is very sensitive to moisture, especially if there is a lot of bleeding after extraction.

Subsequent examination of the patient revealed that multiple crown and bridge margins were short of tooth structure, decayed, and open which were left untreated by appellant. Subsequently, patient was required to have major dental work done to repair the damage, in addition to the surgery to remove the impression material and/or acrylic material and/or dental material from her sinus.

On March 25, 2008, the Board received a report of settlement, judgment or arbitration award under Business & Professions Code section 801 from the American Insurance Company, which resolved Los Angeles Superior Court case No. NC042076 between appellant and patient. The report stated that a settlement had been paid on behalf of appellant to patient on March 6, 2008, and that a portion of impression material was forced into patient's sinus, resulting in an oral fistula that had to be removed.

### *Causes for discipline*

The first cause for discipline alleged in the accusation was unprofessional conduct -- gross negligence. Appellant was accused of failing to follow proper treatment sequencing, such as to perform comprehensive periodontal procedures prior to fixed prosthodontic procedures, which was an extreme departure from the standard of care. Appellant was accused of repeatedly placing ill-fitting bridges and crowns in the patient. Such bridges and crowns should have been carefully evaluated for proper fit and should have included clinical evaluation of margins and contours, among other things. Finally, appellant was accused of fabricating maxillary dental impressions and/or fabricating an acrylic temporary bridge without taking extra precaution immediately after an extraction, resulting in impression material and/or acrylic material being extruded into the maxillary sinus. The accusation alleged that such conduct was gross negligence.

The second cause for discipline was unprofessional conduct -- repeated acts of negligence. In this cause of action, appellant was accused of failing to obtain informed

4

consent from the patient which should have advised her of the risks and alternative available treatments. In addition, appellant's patient record documentation was deficient in 18 of 25 entries, which is a departure from the standard of care. The second cause for discipline also repeated the allegations from the first cause for discipline.

The third cause for discipline was for unprofessional conduct--incompetence. Appellant was accused of committing acts of incompetence, as set forth in the preceding paragraphs and causes for discipline.

The fourth cause for discipline was aiding and abetting of an unlicensed person to practice dentistry, permitting staff to perform procedures not included in the list of permitted duties, and failure to supervise. On July 25, 2005, appellant's dental assistant, Peterson, adjusted and cemented the patient's crown and bridge without any supervision by appellant in violation of Business and Professions Code sections 1750.1, 1750.3, 1752.4, 1753.5, and 1753.6. Only a Registered Dental Assistant with Extended Functions (RDA-EF) can perform these functions under the direct supervision of an attending dentist. Allowing staff members to perform procedures not on the list of their permitted duties is unprofessional conduct.

The fourth cause for discipline also alleged that from February 21, 2005, through and including October 25, 2005, Peterson performed various dental treatment procedures on the patient that were outside the scope of duties of a regular dental assistant.

***Aggravating matters***

The accusation alleged the following aggravating factors to be considered to determine the degree of discipline:

On or about July 7, 1983, in a prior disciplinary action entitled *In the Matter of the Statement of Issues Against Peter Spennato, Jr.*, case No. AGS 1982-05, before the Board, appellant entered into a stipulated settlement whereby appellant's Application for Examination for Licensure to practice dentistry and accompanying Application for Re-examination for dental licensure were denied. Appellant failed the licensure examination in June 1982 and thereafter attempted to have another individual, who was a licensed dentist and classmate of appellant's, take the examination in his place. The classmate

appeared in the place of appellant and attempted to take the examination for appellant. Due to this act of dishonesty, fraud and deceit, appellant's Application for Examination for Licensure to practice dentistry and accompanying Application for Re-examination for dental license were denied.

### *Related matters*

The accusation set forth several matters for the Board to consider in determining discipline.

First, on or about August 17, 1987, in a disciplinary action before the Board of Dental Examiners for the State of Arizona (Arizona Board), appellant was censured for making false statements on his Application for Licensure in Arizona. Specifically, appellant gave a false statement that he failed the California licensure examination in August 1982, when in fact he never took an August 1982 licensure examination. Rather, he failed the California licensure examination in June 1982 and thereafter attempted to have another individual take the August 1982 examination in his place. Because of this act of dishonesty, appellant was placed on probation for five years, fined in the amount of $4,000, and subjected to certain terms and conditions including 150 hours of public service for each year of probation.

Further, in appellant's 1990 California Application for Licensure to Practice Dentistry, appellant failed to notify the Board of another Arizona order which placed him on probation for six months and required him to present three cases of complex treatment to the Arizona Board for their review.

On August 25, 1994, the Arizona Board responded to a complaint and determined that (1) appellant's clinical examination was inadequate; (2) appellant's radiographs were inadequate due to a limited number taken; (3) appellant's diagnosis was inadequate; (4) appellant's treatment planning was inadequate; and (5) billing irregularities were a concern.

### *Prayer*

The accusation sought a decision revoking or suspending appellant's dental license; ordering appellant to pay the Board the reasonable costs of the investigation and

6

enforcement of the matter; and taking any such further action as deemed necessary and proper.

**The Board's decision**

On October 3, 2012, after a six-day administrative hearing held before Administrative Law Judge Samuel Reyes (ALJ), the Board adopted the ALJ's proposed decision and issued its administrative decision revoking appellant's dental license effective November 2, 2012.

In his proposed decision, the ALJ rendered specific factual findings. He noted that appellant's testimony that appellant believed Peterson was an RDA-EF was not credible because "any reasonable, prudent dentist would have verified Peterson's credentials before entrusting her with work reserved for dentists." The ALJ found that appellant's claimed ignorance constituted "a transparent attempt to mask his knowledge."

The proposed decision stated the following justification for the penalty of revocation:

> "The violations that were established are very serious and placed the patient at risk of significant harm. Routine use of a dental assistant to perform tasks that require the training and skill of a dentist, typically without actual or direct supervision, placed E.S. in harm's way. [Appellant's] use of unlicensed assistants, and his failure to adhere to the standard of care with respect to basic requirements of the practice of dentistry, such as proper treatment sequencing, proper fitting of crowns and bridges, and proper record keeping, demonstrates his present unfitness to continue to practice. Given his extensive discipline over a period of almost 30 years, and which has involved acts of dishonesty as well as acts of negligence, probation at this time is not an option. The order that follows is therefore necessary for the protection of the public."

Appellant's dental license was revoked and he was ordered to pay the Board $34,562.50 for its investigative and enforcement costs.

**Writ of administrative mandamus**

Appellant petitioned the superior court for a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5. On December 6, 2013, the court denied appellant's petition.

7

In its written decision, the trial court noted that its review of the Board's determination was conducted under the "independent judgment" standard. The court found the weight of the evidence supported the Board's findings on the issues of improper treatment of E.S. As to aiding and abetting the unlicensed practice of dentistry, the trial court held:

> "The [appellant's] argument with respect to the aiding and abetting charged begins by admitting that Peterson was not an RDA-EF . . . , but performed the procedures which were only permissibly performed by an RDA-EF (or, presumably, a dentist). However, [appellant] contends that Peterson is a 'liar' and asserts that she never told him she was not an RDA-EF and he didn't know. [Appellant] cites no portion of the record which establishes an innocent mindset, simply contending that this is a reasonable conclusion, considering that Peterson worked for him for 20 years and supervised other RDA-EF's. [Appellant] provides no logical or evidentiary basis for selecting his preferred explanation from another, equally reasonable explanation -- namely that the [appellant] knew that Peterson was not an RDA-EF but permitted her to practice the dental arts in a manner not authorized by law. Indeed, the [Board] found [appellant's] explanation that he remained ignorant of Peterson's true lack of credentials for 20 years to be 'incredible' in the root sense -- i.e., not worthy of credence. . . . The [Board's] determination is also amply supported by common sense. The Court finds no abuse of discretion in the [Board's] determination on this issue, and the weight of the evidence supports the findings and determination."

The trial court also addressed appellant's claims that the prior disciplinary actions were remote in time and should not have been considered. The trial court found that "[w]hile these may be infractions which are remote in time and space, they are not remote in terms of the underlying misconduct. The Court finds that they were properly considered when determining whether the permissible option of revocation should be exercised. Moreover, the [appellant] neglects to mention that his 'clean' 20 year history is roughly contemporaneous with the period where he was retaining Peterson and aiding her unauthorized practice of dentistry . . . ."

The trial court declined to set aside the Board's penalty determination of license revocation.

**Appeal**

On December 30, 2013, appellant filed his notice of appeal.

## DISCUSSION

### I.  Substantial evidence supports the trial court's decision

Appellant challenges the factual findings on improper treatment and aiding and abetting the unlicensed practice of dentistry.

#### A.  *Standard of review*

The burden of proof in administrative proceedings involving the revocation or suspension of a professional license is clear and convincing proof to a reasonable certainty.  (*James v. Board of Dental Examiners* (1985) 172 Cal.App.3d 1096, 1105 (*James*).)

Code of Civil Procedure section 1094.5 "structures the procedure for judicial review of adjudicatory decisions rendered by administrative agencies."  (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514.)  In a proceeding inquiring into the validity of a final administrative order, a trial court's review is limited to the question of whether the administrative agency proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was a prejudicial abuse of discretion.  A prejudicial abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.  (Code Civ. Proc., § 1094.5, subd. (b).)

When an administrative agency decision is challenged by a petition for a writ of administrative mandamus, one of two standards of review is used in the trial court. (*Malibu Mountains Recreation, Inc. v. County of Los Angeles* (1998) 67 Cal.App.4th 359, 366.)  If the administrative decision substantially affects a fundamental right, the trial court must exercise the independent judgment test.  (*Id.* at p. 367.)  All other decisions are subjected to substantial evidence review.  (*Ibid.*)  The suspension or revocation of an existing license has been held to affect a vested right.  (*Merrill v. Department of Motor*

*Vehicles* (1969) 71 Cal.2d 907, 915.)  Accordingly, the trial court was required to use its independent judgment in reviewing the Board's decision in this matter.

However, "[i]n exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*).)

We review the trial court's findings and decision for substantial evidence. (*Fukuda, supra*, 20 Cal.4th at p. 824.)  Under this standard, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the trial court judgment. Therefore, if there is any doubt as to the sufficiency of the evidence to sustain a finding, we should resolve that doubt in favor of the finding.  (*Moran v. Board of Medical Examiners* (1948) 32 Cal.2d 301, 308-309 (*Moran*).)

### B.  Aiding and abetting unlicensed practice of dentistry

Appellant cites *James* for the proposition that an individual may not be disciplined unless such discipline is based on his own acts of misfeasance or "such acts by those working with him of which he had personal knowledge and which he actually ratified. [Citation.]" (*James, supra*, 172 Cal.App.3d at p. 1110.)  The crux of appellant's argument regarding the aiding and abetting finding is that there was insufficient evidence for the trial court to find that appellant knew that Peterson was not an RDA-EF during the 20-year period that Peterson worked for him.

#### 1.  Evidence supporting appellant's position

Appellant argues that Peterson was a liar, who knew for 20 years that she was violating the law and lied to appellant when she was hired.  Appellant points out that Peterson lied when she was first interviewed by an investigator in this matter.  Peterson admitted at the hearing that her statements to the investigator that she had never taken impressions; that appellant was always in the room during certain procedures; and that she rarely rendered direct patient care were false.  In addition, Peterson had a civil

10

lawsuit pending against appellant at the time of the administrative hearing, and she was granted immunity from criminal prosecution for appearing and testifying truthfully in the administrative proceeding. Appellant argues that this information was not fully and properly considered by the ALJ.

Under appellant's version of the facts, all evidence points to the reasonable conclusion that Peterson misled appellant into believing that she was an RDA-EF. She worked for him as an RDA-EF for 20 years, she supervised dental assistants and other RDA-EFs, and, after appellant sold his practice to the new owner, Dr. Ardary, Peterson continued to perform the same duties at the office.

Appellant also points to evidence that he had a company come in once a year to make sure that his company was in compliance with all O.S.H.A. requirements.

Appellant highlights the fact that Peterson never testified that appellant knew she was not an RDA-EF or that she told him that she was not an RDA-EF. Thus, appellant argues, there was no direct evidence that in the 20 years Peterson worked for appellant that he knew she was not licensed. Appellant states, without citation to the record, that there was no reason for appellant to suspect that she was not an RDA-EF. Appellant testified that he hired Peterson as an RDA-EF, that she came in with 20 years of experience and was very competent. Thus, he had no reason to doubt her word.

### 2. Evidence supporting the trial court's decision

The Board views the facts from a completely different perspective. The Board points out that, in contrast to appellant's testimony, office manager Peggy Murphy (Murphy) testified that Peterson was hired as a dental assistant, not as an RDA-EF. Appellant had no documentation or pay check stubs proving that Peterson was employed at his dental office as an RDA-EF, and appellant admitted he never verified appellant's credentials during her 20 years of employment with his office. Murphy, who managed appellant's office for 17 years, testified that Peterson was always employed as a dental assistant.

### 3. Analysis

The trial court considered appellant's arguments that Peterson is a liar and never told appellant that she was not an RDA-EF. The trial court found that the weight of the evidence supported the Board's decision that appellant knew that Peterson was not an RDA-EF and was guilty of aiding and abetting her unlicensed practice of dentistry. The trial court noted that the Board found appellant's testimony that he was ignorant of Peterson's lack of credentials to be unworthy of credence. The trial court held that appellant's lack of credibility on this point is supported by the weight of the evidence and by common sense.

Murphy's testimony that Peterson was hired as a dental assistant and remained employed as a dental assistant throughout her 20-year employment supports this decision. Murphy's testimony contradicts appellant's testimony that he hired Peterson as an RDA-EF, and paid her as an RDA-EF. Since appellant was the employer, Murphy's testimony points to the conclusion that appellant knew that Peterson was hired and employed at the office as a dental assistant.[1]

We find that Murphy's testimony constitutes substantial evidence that appellant hired and employed Peterson as a dental assistant, not an RDA-EF. Although Murphy's testimony is contradicted by appellant's testimony, it remains substantial evidence of appellant's knowledge of Peterson's lack of credentials. Due to the existence of this substantial evidence, we must resolve the matter in favor of the trial court's finding. (*Moran, supra*, 32 Cal.2d at pp. 308-309.)

### C. Negligence

Appellant also challenges the findings that he failed to follow proper treatment sequencing; placed ill-fitting bridges and a crown in the patient; and negligently caused dental material to be extruded into the patient's maxillary sinus.

---

[1] Appellant has not argued that he was generally unaware of the positions held by his employees. Instead, he argued that he hired Peterson as an RDA-EF and that she held herself out to be an RDA-EF throughout her employment. Murphy's testimony suggests this is not true, and that in fact, Peterson was hired and employed as a dental assistant.

12

Appellant acknowledges that both sides offered significant evidence on these issues from qualified dental experts, and that those experts had differing opinions.

### 1. Treatment sequencing

As to the treatment sequencing, the trial court indicated a lack of evidence in the record to support a finding that appellant followed the proper course of treatment sequencing. The trial court cited the "fundamentally unchallenged" opinion of the Board's expert, Mark Steven Kahn, and noted that the records of both Dr. Lott and Dr. Yanase suggested that permanent restoration did not wait until after E.S.'s periodontal conditions had been resolved. Thus, the trial court found no abuse of discretion in the Board's finding that appellant did not follow the proper treatment sequencing.

Substantial evidence supports the trial court's conclusion. Dr. Kahn testified that the accepted treatment sequencing would be (1) dealing with an urgent situation such as pain and swelling; (2) treating infectious disease such as cavities, periodontal disease, and gum and bone disease; and finally (3) replacing missing teeth and restoring teeth that need crowns and bridges. Dr. Kahn reviewed the Board's complaint regarding appellant's treatment of E.S. He concluded that appellant's treatment of E.S. constituted an extreme departure from the standard of care. One of the reasons appellant's conduct was an extreme departure from the standard of care was inadequate sequencing of care. In the treatment process, steps were not completed, which left E.S. at risk of a deteriorating oral health situation.

Dr. Kahn explained that nothing in E.S.'s record from April 26, 2004, shows that anything was done to treat E.S.'s periodontal condition. The periodontal disease should have been treated at that time. In addition, numerous cavities that were identified were not taken care of. Dr. Kahn concluded:

> "And what we see here is that there was a move from -- from an exam to, essentially, doing crown and bridge, skipping the step of eliminating the periodontal disease and eliminating the cavity process. So that by the time [appellant] went around and treated the various areas that he treated, there were some areas where the decay had progressed to the point where it became very, very serious."

13

The proper approach would be "to remove decay in all the teeth that had caries to stop the disease process, so no teeth would be getting worse while you're doing the crown and bridge."

Our power begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the trial court judgment. (*Moran, supra*, 32 Cal.2d at pp. 308-309.)

The evidence described above constitutes substantial evidence supporting the trial court's finding that "permanent restoration did not wait until after E.S.'s periodontal conditions had been resolved" and that the weight of the evidence supported the Board's determination that proper sequencing was not followed.

### 2. Ill-fitting bridges and crowns

Appellant also argues that the bridges he provided were not negligently placed. Appellant argues that he did not place one of the bridges; that another was only temporary; and that the fit of a third bridge was caused by surgery performed by a different doctor.

Despite appellant's argument that the evidence supports his position, contrary evidence exists in the record. Dr. Kahn analyzed panoramic x-rays of E.S.'s teeth taken in 2006, and notes from a clinical exam done by Dr. Yanase, and he testified that tooth Nos. 2, 6, 18 and 21 had ill fitting bridges and crowns. Dr. Kahn also rebutted the evidence provided by appellant's expert that a defect on tooth No. 3 was related to the surgery performed by a different doctor. Dr. Kahn testified, "the defect in . . . [No.] 3 for sure was a result of an extraction and defective healing as a result of an oral-antral fistula." He added that it could not have been caused by the surgery, as the surgery "is not performed anywhere near that area."

Dr. Yanase also testified for the Board. Dr. Yanase examined E.S. and examined her dental records in October 2006. He noted that at the time of the examination, tooth Nos. 2, 6, 8, 9, 13, 15, 17, 18, 29 and 31 had poor fitting bridges or crowns and decay.

This testimony constitutes substantial evidence supporting the trial court's determination on the issue of ill-fitting bridges.

14

### 3.  Fabrication of acrylic temporary bridge without taking extra precaution immediately after extraction

Appellant argues that the evidence showed that it was only after the oral surgeon, Dr. Omoto, repaired the opening left by the tooth extraction that the temporary bridge was fitted.  Appellant provides no citation to the record for these facts.

Dr. Kahn testified that after a tooth extraction, it takes about 12 weeks for the gum to heal.  On the first day of the extraction, it is essential that the blood clot in the area is preserved because that is the framework for all future healing.  To disturb the blood clot would mean that the patient would have delayed healing, as the patient did in this case.  If you are planning to do a restoration in that area, taking an impression on the same day would have serious consequences because it could disturb the blood clot.  In dental school an individual is taught that it takes six to eight weeks for the extraction to heal.  The longer you wait, the better the area is healed and you will get the best fit in order to facilitate oral hygiene and ensure that the patient does not trap food and bacteria in the opening.

In addition, Dr. Kahn testified that the texture of the acrylic material used for the bridge goes from a liquid state to a rubbery state to a hard state.  A dentist would not want to introduce this material when a patient's condition would allow flow into the extraction site.

Dr. Yanase was also of the opinion that appellant erred in making impressions of the large span bridge after the extraction of tooth No. 3.

Peterson testified that she recalled E.S. having dental work done in appellant's office.  She further testified that appellant did not like his patients walking around with a space.  Therefore, he would prepare teeth on either side of the extraction site and immediately after the tooth was removed, he would have the patient return for a healing bridge.  Peterson recalled that an assistant had difficulty removing the mold from E.S.'s teeth on the day of extraction.  Peterson came to assist her, removed the mold and noticed that the acrylic material from the dental impression had gone up into the socket site.  Peterson notified appellant of the situation.

15

An August 3, 2005 letter to appellant from Dr. Omoto indicated that five months after the extraction of tooth No. 3, Dr. Omoto examined the area and noted there was a non-healing wound directly over the ridge crest. Dr. Omoto found a considerable amount of debris in the wound and that there was a communication extending up into the maxillary sinus.

This evidence supports the trial court's finding of appellant's negligence in the creation of a temporary acrylic bridge for tooth No. 3.

Appellant admits there is a factual basis for this, and the other findings of negligence, in the record. However, appellant points to the clear and convincing standard which is relevant in the administrative proceeding. Clear and convincing proof has been defined as proof "'"sufficiently strong to command the unhesitating assent of every reasonable mind."' [Citation.]" (*In re Angelia P.* (1981) 28 Cal.3d 908, 919.) Appellant argues that the ALJ would have had to ignore all of the testimony given on behalf of appellant in order to come to the conclusion which, according to the law, must be sufficiently strong so as to command the unhesitating assent of every reasonable mind. Appellant claims the ALJ must have found that appellant's experts were not in possession of reasonable minds.

Our task is not to review the ALJ's decision for clear and convincing proof to a reasonable certainty. In a case where a license revocation is at issue, the trial court is required to exercise its independent judgment on the evidence. (*Lozano v. Unemployment Ins. Appeals Bd.* (1982) 130 Cal.App.3d 749, 754.) "On appeal, however, '"the question is not whether the administrative determination was supported by the weight of the evidence, but whether . . . there is substantial evidence in support of the *trial court's findings*." [Citations.]' [Citation.]" (*Aantex Pest Control v. Structural Pest Control Bd.* (1980) 108 Cal.App.3d 696, 701.) Substantial evidence existed on all negligence issues, thus the trial court's findings must be affirmed.

## II. No abuse of discretion in imposing a penalty of license revocation

### A. *Standard of review*

"The propriety of a sanction imposed by an administrative agency is a matter resting in the sound discretion of that agency, and that decision will not be overturned absent an abuse of discretion. [Citations.]" (*Hughes v. Board of Architectural Examiners* (1998) 68 Cal.App.4th 685, 692 (*Hughes*).) As to issues reviewed in the superior court under an abuse of discretion standard, "the appellate court reviews the administrative determination, not that of the superior court, by the same standard as was appropriate in the superior court. [Citations.]" (*Schmitt v. City of Rialto* (1985) 164 Cal.App.3d 494, 501 (*Schmitt*).)

Thus, when reviewing an issue regarding the level of discipline imposed, "the standard of review on appeal remains the same as it was in the superior court: the administrative agency's exercise of discretion as to the discipline to be imposed will not be disturbed unless a manifest abuse of discretion is shown. [Citation.]" (*Schmitt, supra*, 164 Cal.App.3d at p. 501.) "'Neither a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed.' [Citations.]" (*Hughes, supra*, 68 Cal.App.4th at p. 692.) "This rule is based on the rationale that 'the courts should pay great deference to the expertise of the administrative agency in determining the appropriate penalty to be imposed.' [Citation.]" (*Ibid*., fn. omitted.)

"'One of the tests suggested for determining whether the administrative body acted within the area of its discretion is whether reasonable minds may differ as to the propriety of the penalty imposed. The fact that reasonable minds may differ will fortify the conclusion that there was no abuse of discretion.' [Citation.]" (*Hughes, supra*, 68 Cal.App.4th at p. 692.)

### B. *The law supports the penalty of license revocation*

Business and Professions Code section 1670 provides that "[a]ny licentiate may have his license revoked . . . for unprofessional conduct, or incompetence, or gross

negligence." The aiding or abetting of any unlicensed person to practice dentistry is considered to be unprofessional conduct. (Bus. & Prof. Code, § 1680, subd. (c).)

The Board's Disciplinary Guidelines provide that the maximum penalty for gross negligence or incompetence is revocation of licensure. The maximum penalty for aiding and abetting the unlicensed practice of dentistry is also license revocation.

Under the laws set forth above, license revocation is among the acceptable administrative penalties for the acts described in the accusation. The Board thus proceeded in a manner supported by the law.

### C. *The Board did not abuse its discretion in weighing the factors*

The Board's Disciplinary Guidelines provide 12 factors to be considered "[i]n determining whether revocation, suspension or probation should be imposed in a given case." Those factors are: (1) nature and severity of the act(s), offense(s), or crime(s) under consideration; (2) actual or potential harm to the public; (3) actual or potential harm to any patient; (4) prior disciplinary record; (5) number and variety of violations; (6) mitigation evidence; (7) aggravating evidence; (8) rehabilitation evidence; (9) in case of a criminal conviction, compliance with conditions of sentence and court-ordered probation; (10) criminal record; (11) time passed since the act(s) or offense(s) occurred; and (12) if applicable, evidence of expungement proceedings pursuant to Penal Code section 1203.4.

Under these guidelines, the Board properly considered appellant's prior disciplinary record, including the discipline imposed by the Dental Board of Arizona as well as the prior discipline imposed by the Board after appellant's classmate impersonated him during the 1982 California Dental Board examination. Appellant emphasizes that those violations occurred 30 years ago, and that appellant has since made his peace with the Board and was allowed to take the exam after complying with his penalty. Appellant argues that he has been subjected to a new form of double jeopardy. He states that he has a "spotless" record over the last 20 years, with the exception of the current matter. Appellant argues that he demonstrated his rehabilitation by being granted a license to practice by both Arizona and California. In addition, during the pendency of

these proceedings, he took courses on the subjects contained within the accusation, such as restoration and laws relating to the operation of a dental practice. The courses also included material regarding the duties of dental assistants and RDA-EFs and the use of evidence-based information to determine the best treatment for a patient.

In its decision, the Board stated that "[a]ll evidence presented in mitigation or rehabilitation, as well as that presented in aggravation, has been considered." In determining that the penalty of revocation was necessary for the protection of the public, the Board emphasized the severity of the current violations and appellant's failure to adhere to the standard of care with respect to basic requirements of the practice of dentistry. The Board found that the violations at issue were severe and put E.S. at risk of significant harm. The record reveals no abuse of discretion in the Board's weighing of the factors relevant to license revocation.

Appellant takes issue with the statement contained in the decision noting appellant's "extensive discipline over a period of almost 30 years." Appellant argues that his record with the California Dental Board is "pristine" over the 20 years he has been licensed in California.

As set forth above, we do not disturb administrative sanctions "absent an abuse of discretion. [Citations.]" (*Hughes, supra*, 68 Cal.App.4th at p. 692.) Even if reasonable minds might differ on the appropriateness of the penalty imposed here, the law and the evidence show that the Board acted within its discretion. (*Ibid.*) As the trial court noted, the 30-year period discussed in the Board's decision covers the time period during which appellant not only committed fraud in attempting to obtain licenses in both California and Arizona, but also retained Peterson and aided and abetted her unauthorized practice of dentistry. Under the circumstances, we decline to find an abuse of discretion in the Board's decision to impose the penalty of license revocation and therefore affirm the judgment of the trial court.

19

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST